TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MARIA ELENA STITELER (Cal. Bar No. 296086)
Assistant United States Attorney
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6148
    Facsimile: (213) 894-0141
    E-mail:    Maria.Stiteler@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| IN RE CELLULAR TELEPHONE | No. 2:21-MJ-04223 |
|---|---|
| | GOVERNMENT'S *EX PARTE* APPLICATION FOR A WARRANT AUTHORIZING (1) THE DISCLOSURE OF GPS AND CELL-SITE INFORMATION AND (2) USE OF CELL-SITE SIMULATOR; REQUEST TO SEAL; AFFIDAVIT OF ELLIS BEAMON |
| | **(UNDER SEAL)** |

I.    INTRODUCTION

The United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, hereby applies for a warrant requiring cellular telephone service provider(s) to furnish the Drug Enforcement Administration (the "Investigating Agency") with information relating to the following cellular telephone: (323) 847-4474, a cellular telephone issued by T-Mobile or its affiliates subscribed to "Cesar P Leather" at "3369 California St, Unit A, Huntington PK, CA 90255" and believed to be used by Giovanni SEPULVEDA ("SEPULVEDA") (the **Subject Telephone**).

1     Authorization is sought to obtain prospective cell-site
2  information, as well as the physical location of the **Subject**
3  **Telephone,** to include E-911 Phase II data and latitude and longitude
4  data gathered for the **Subject Telephone,** including Global Positioning
5  Satellite and/or network timing information, including Sprint's Per
6  Call Measurement Data, Verizon's Real Time Tool, AT&T's Network Event
7  Location System and T-Mobile's True Call data, and including
8  information from such programs as Nextel Mobile Locator, Boost Mobile
9  Loopt, Sprint/Nextel Findum Wireless, which will establish the
10 approximate location of the **Subject Telephone,** and which information
11 is acquired in the first instance by the Carrier ("GPS information"),
12 at such intervals and times as the government may request, and the
13 furnishing of all information, facilities, and technical assistance
14 necessary to accomplish said disclosure unobtrusively, for a period
15 of 45 days.

16     Additionally, this application seeks authorization for the
17 Investigating Agency to use a cell-site simulator, commonly referred
18 to as a "Stingray," in order to obtain dialing, routing, addressing,
19 or signaling information (but not content) from the **Subject**
20 **Telephone,** whether in use or not.

21     The application is made in connection with an investigation of
22 offenses committed by SEPULVEDA, and others known and unknown (the
23 "Target Subjects"), specifically, violations of 21 U.S.C. §§ 846,
24 841(a)(1) (conspiracy to distribute and distribution of controlled
25 substances) and 843(b) (use of a communication facility to facilitate
26 a narcotics trafficking offense) (the "Target Offenses"), and is
27 based upon the attached agent affidavit.  There is probable cause to
28 believe that federal crimes are being committed and that the

information likely to be received concerning the approximate location of the **Subject Telephone**, currently within, or being monitored or investigated within, the Central District of California, will constitute or yield evidence of those crimes.

A previous order was obtained on July 29, 2021, in Case No. 2:21-MJ-03515 from Magistrate Judge Alicia G. Rosenberg for the same **Subject Telephone**, and is due to expire on September 12, 2021.

## II.   CELL SITE AND GPS INFORMATION FROM THE CARRIER

The information sought by this application includes information about the location (physical address) of the "cell-sites" linked to the **Subject Telephone** at call origination (for outbound calling), call termination (for incoming calls), and, if reasonably available, during the progress of a call.  This information, which is acquired in the first instance by the Carrier, includes any information, apart from the content of any communication, that is reasonably available to the Carrier and that is requested by the Investigating Agency, concerning the cell-sites/sectors receiving and transmitting signals to and from the **Subject Telephone** whether or not a call is in progress.  This prospective information is sought based on 18 U.S.C. § 2701 et seq. (the "Stored Communications Act").  The Stored Communications Act provides:

> A governmental entity may require a provider of electronic communication service...to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only[1] when the governmental entity --

---

[1] This section also provides other methods to compel disclosure, including via subpoena or court order.  However, the government in this case is proceeding under the highest threshold, that is, obtaining a warrant as described in § 2703(c)(1)(A).

1

2

        (A)   obtains a warrant issued using the procedures
              described in the Federal Rules of Criminal
              Procedure...by a court of competent
              jurisdiction[.][2]

3

4   18 U.S.C. § 2703(c)(1); see also Carpenter v. United States, 138

5   S.Ct. 2206 (2018) (holding that a warrant is required to obtain seven

6   or more days' worth of historical cell-site information).[3]

7       Prospective cell-site information is also sought based on the

8   authority of 18 U.S.C. § 3121 et seq. (the "Pen Register Statute").[4]

9

10      [2] This Court is a "court of competent jurisdiction" because it

11  is a "district court of the United States (including a magistrate
    judge of such a court) . . . that . . . has jurisdiction over the

12  offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  This is
    true even if the subject of the investigation, and/or his or her

13  phone, is in another district.  See, e.g., United States v. Ackies,
    918 F.3d 190, 201-02 (1st Cir. 2019) (finding in the context of a

14  warrant issued in one district for location information regarding
    phones physically located in another district that § 2703's plain

15  text and structure, supported further by legislative history and
    Congressional intent, make clear that § 2703 permits searches not
    governed by Rule 41's geographic limitations).

16      [3] The definition of terms in the Stored Communications Act makes

17  clear that the "record or other information" that a court may order a
    provider to disclose to the government under Section 2703(c)(1)(A)

18  includes both cell site and other location information.  First, the
    Stored Communications Act expressly adopts the definition of

19  statutory terms set forth in 18 U.S.C. § 2510.  See 18 U.S.C. § 2711
    ("As used in this chapter. . . (1) the terms defined in section 2510

20  of this title have, respectively, the definitions given such terms in
    that section").  Thus, the term "provider of electronic communication

21  service" used in Section 2703(c) covers cellular telephone service
    providers, because 18 U.S.C. § 2510(15) defines "electronic

22  communications service" as "any service which provides to users
    thereof the ability to send or receive wire or electronic

23  communications."  18 U.S.C. § 2510(15).  Further, cell site and other
    location information is "a record or other information pertaining to

24  a subscriber to or customer of" an electronic communications service
    – another term used in Section 2703(c) – because cellular telephone

25  service providers receive and store the information, if sometimes
    only momentarily, before forwarding it to law enforcement officials.

26  See In Re: Application of the United States for an Order for
    Prospective Cell Site Location Information on a Certain Cellular

27  Telephone, 460 F. Supp. 2d 448, 457-60 (S.D.N.Y. 2006).

        [4] 18 U.S.C. § 3127(3) defines "pen register" as "a device or

28  process which records or decodes dialing, routing, addressing, or
                                                *(footnote cont'd on next page)*

The government therefore also complies with the provisions of that statute, including by providing the required certification by the attorney for the government at the end of this application.  Pursuant to the Pen Register Statute, upon an application made under 18 U.S.C. § 3122(a)(1) a court "shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation."  18 U.S.C. § 3123(a)(1).[5]

Cellular telephone companies routinely create and maintain, in the regular course of their business, records of information concerning their customers' usage.  These records typically include for each communication a customer makes or receives (1) the date and time of the communication; (2) the telephone numbers involved; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.  The records may also, but do not always, specify a particular sector of a cell tower used to transmit a communication.

signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication."  A "trap and trace" device is similarly defined for any device or process which captures incoming data.  See 18 U.S.C. § 3127(4).

[5] While 47 U.S.C. § 1002, which is part of the Communications Assistance for Law Enforcement Act of 1994 ("CALEA"), would preclude seeking physical location information based on the Pen Register Statute alone, the Stored Communications Act provides the requisite additional authority for this Court to authorize the production by the Carrier of cell-site information to the government.

Cell-site information is useful to law enforcement because of the limited information it provides about the general location of a cell phone when a communication is made.

This application also seeks GPS information for the **Subject Telephone**, which is sought based on 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41.  As discussed above, data that provides information about the location of a customer's phone falls within 18 U.S.C. § 2703(c)'s definition of "a record or other information pertaining to a subscriber to or customer of [an electronic communication service]."  Thus, the United States may obtain a warrant requiring a cell phone company to disclose GPS information "using the procedures described in the Federal Rules of Criminal Procedure," that is, Federal Rule of Criminal Procedure 41, as is contemplated by this application and order.

Some, but not all, cellular telephone service providers have the technical means to obtain GPS information.  GPS information is not generated specifically for law enforcement, but is the product of United States Federal Communications Commission requirements that cellular telephone service providers maintain and access location information for emergency responders.  To obtain GPS information, a "ping" (electronic signal) is sent to the cellular telephone, which unobtrusively activates the GPS chip in the telephone.  This information is not provided in a streaming fashion regardless of the cellular telephone activity, but instead is sent only in response to specific law-enforcement agency requests.  Location data through GPS information can be delivered as accurately as within three meters; however, if the cellular telephone is in motion, such as while in a moving vehicle, the error range in meters may be greater, or the

cellular telephone service provider may simply provide cell-site
information.  In addition, the cellular telephone must be powered on
and, usually, not in the middle of a telephone call, for GPS
information to be obtained.  Moreover, if the cellular telephone is
inside a building, or is in some other way blocked from the
satellite, GPS information may not be obtainable.  In such cases, the
service provider will often provide law enforcement with cell-site
information instead.

III. CELL-SITE SIMULATOR

     This application also seeks a warrant authorizing the
Investigating Agency to use a cell-site simulator, commonly referred
to as a "Stingray," to obtain dialing, routing, addressing, or
signaling information from the **Subject Telephone**, whether in use or
not.  This device simulates a cell site, and by combination of
surveillance and action as a mobile cell site, allows the
Investigating Agency to locate the **Subject Telephone** more
conclusively.  This Court has authority to issue the requested
warrant under Fed. R. Crim. P. 41(b)(1) and (b)(2) because, as
explained in the agent affidavit, the **Subject Telephone** is currently
believed to be located within this District.[6]  Because collecting the
information authorized by this warrant may fall within the statutory
definitions of a "pen register" or a "trap and trace device," see 18
U.S.C. § 3127(3) & (4), the application and proposed warrant are
designed to comply with the requirements of the Pen Register Statute
as well as Rule 41.  See 18 U.S.C. §§ 3121-3127.  The warrant

---

     [6] Pursuant to Rule 41(b)(2), law enforcement may use the cell-
site simulator outside this District provided the **Subject Telephone**
is within the District when the warrant is issued.

1  therefore includes all the information required to be included in a

2  pen register order.  See 18 U.S.C. § 3123(b)(1).

3                    IV.  OTHER REQUESTED ORDERS

4       Additionally, this application also seeks authorization under 18

5  U.S.C. § 3103a(b), for reasonable cause shown, to delay any

6  notification the government is required to give regarding the

7  requested warrant to the subscriber(s) and user(s) of the **Subject**

8  **Telephone** for a period of 30 days from the date that the disclosure

9  ends.  18 U.S.C. § 3103a(b) states that any notice required following

10  the issuance of a warrant may be delayed if, inter alia, the court

11  finds reasonable cause to believe that providing immediate

12  notification of the execution of the warrant may have an adverse

13  result.  An adverse result is defined in 18 U.S.C. § 2705(a)(2) to

14  include endangering the life or physical safety of a person, flight

15  from prosecution, destruction of or tampering with evidence,

16  intimidation of potential witnesses, or otherwise seriously

17  jeopardizing an investigation or unduly delaying a trial.  Moreover,

18  the Advisory Committee Notes for Fed. R. Crim. P. 41(f)(3) (2006

19  Amendments) state that delay of notice may be appropriate where "the

20  officer establishes that the investigation is ongoing and that

21  disclosure of the warrant will compromise that investigation."  The

22  attached agent affidavit provides reasonable cause to believe that

23  immediate notification of the execution of the warrant may have an

24  adverse result.  The proposed warrant both provides for the giving of

25  such notice within 30 days after the date that the disclosure ends

26  and prohibits, as part of the receipt of the requested information,

27  the seizure of any tangible property or any other prohibited wire or

28  electronic information as stated in 18 U.S.C. § 3103a(b)(2).  As

discussed in the attached agent affidavit, immediate notification of this warrant to the user(s) of the **Subject Telephone** may have an adverse result.

Similarly, pursuant to 18 U.S.C. § 2705(b) and 18 U.S.C. § 3123(d)(2), this application requests that the Court enter an order commanding the Carrier not to notify any person, including the subscriber(s) of the **Subject Telephone**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States, for the reasons outlined in the attached agent affidavit.

This application also seeks an order that: (1) authorizes the disclosure of the requested information whether the **Subject Telephone** is located within this District, outside of the District, or both, pursuant to 18 U.S.C. § 2703(c)(1)(A) and Rule 41(b), and, for good cause shown, at any time of the day or night pursuant to Rule of Criminal Procedure 41; (2) authorizes the disclosure of not only information with respect to the **Subject Telephone**, but also with respect to any changed telephone number(s) assigned to an instrument bearing the same ESN, IMSI, or IMEI (hereinafter "unique identifying number") as the **Subject Telephone**, or any changed unique identifying number subsequently assigned to the same telephone number as the **Subject Telephone**, or any additional changed telephone number(s) and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same wireless telephone account number as the **Subject Telephone** within the period

of disclosure authorized by the warrant; and (3) orders the Investigating Agency to reimburse the applicable cellular telephone service provider for its reasonable expenses directly incurred in providing the requested information and any related technical assistance.

Finally, this application requests that it, the proposed warrant that has been concurrently lodged, and the return to the warrant be sealed by the Court until such time as the Court directs otherwise or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel. Allowing disclosure to the public at large would likely jeopardize the ongoing investigation for the reasons outlined in the attached agent affidavit.

Dated: September 9, 2021          Respectfully submitted,

                                  TRACY L. WILKISON
                                  Acting United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                     */s/ Maria Elena Stiteler*
                                  MARIA ELENA STITELER
                                  Assistant United States Attorney

                                  Attorneys for Applicant
                                  UNITED STATES OF AMERICA

1

CERTIFICATION

2        In support of this application, and pursuant to 18 U.S.C.

3  § 3122, I state that I, Maria Elena Stiteler, am an "attorney for the

4  Government" as defined in Rule 1(b)(1) of the Federal Rules of

5  Criminal Procedure.  I certify that the information likely to be

6  obtained from the requested warrant is relevant to an ongoing

7  criminal investigation being conducted by the Investigating Agency of

8  the Target Subjects for violations of the Target Offenses.

9        I declare under penalty of perjury under the laws of the United

10  States of America that the foregoing paragraph is true and correct.

11

12

        September 9, 2021                  */s/ Maria Elena Stiteler*
13  DATE                             MARIA ELENA STITELER
                                     Assistant United States Attorney
14                                   General Crimes Section

<u>AFFIDAVIT OF ELLIS BEAMON</u>

I, Ellis Beamon, being duly sworn, declare as follows:

I.   <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of an application for a warrant authorizing the disclosure of cell-site and GPS information, as well as the use of a cell-site simulator, also known as a "Stingray," as defined or discussed within the application, at such intervals and times as the government may request, and the furnishing of all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively, which disclosure will establish the approximate location of the following cellular telephone for a period of 45 days:

2.   (323) 847-4474, a cellular telephone issued by T-Mobile or its affiliates subscribed to "Cesar P Leather" at "3369 California St, Unit A, Huntington PK, CA 90255" and believed to be used by Giovanni SEPULVEDA ("SEPULVEDA") (the **"Subject Telephone").**

3.   I also seek authorization under 18 U.S.C. § 3103a(b), for reasonable cause shown below, to delay notification of the proposed warrant for a period of 30 days from the date that the disclosure ends.

4.   As described more fully below, I respectfully submit there is probable cause to believe that cell-site information, GPS information, and information from a cell-site simulator likely to be received concerning the approximate location of the **Subject Telephone**, will constitute or yield evidence of violations of 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute and distribution of controlled substances), and 843(b) (use of a communication

1  facility to facilitate a narcotics trafficking offense) by SEPULVEDA
2  and others known and unknown (the "Target Subjects").

3      5.    The facts set forth in this affidavit are based upon my
4  personal observations, my training and experience, and information
5  obtained from various law enforcement personnel and witnesses.  This
6  affidavit is intended to show merely that there is sufficient
7  probable cause for the requested warrant and does not purport to set
8  forth all of my knowledge of, or investigation into, this matter.
9  Unless specifically indicated otherwise, all conversations and
10 statements described in this affidavit are related in substance and
11 in part only.

12              II.  <u>BACKGROUND OF AFFIANT</u>

13     6.    I am a United States Drug Enforcement Administration (DEA)
14 Special Agent and an investigative or law enforcement officer of the
15 United States within the meaning of Section 2510(7) of Title 18 of
16 the United States Code.  I am empowered to conduct investigations of
17 and to make arrests for federal felony offenses, including those
18 enumerated in 18 U.S.C. § 2516.

19     7.    I have been employed as a Special Agent with the Drug
20 Enforcement Administration since January 2020, currently assigned to
21 the Los Angeles Field Division (LAFD), Enforcement Group 2.  In the
22 course of my employment with the DEA, I have received approximately
23 16 weeks of specialized training at the DEA Academy in Quantico,
24 Virginia involving the use, possession, packaging, manufacturing,
25 sales, concealment, and transportation of various controlled
26 substances, money laundering techniques, and conspiracy
27 investigations.  I have also participated in narcotics
28 investigations.  I have debriefed defendants and witnesses who had

personal knowledge of narcotics trafficking organizations.
Additionally, I have participated in many aspects of narcotics
investigations including conducting physical surveillance, writing
and executing search warrants, directing confidential informants, and
conducting arrests.  Additionally, I have attended specialized
training in electronic communications exploitation.  Based on my
training and experience, I am familiar with narcotics traffickers'
methods of operation including the distribution, storage, and
transportation of narcotics and the collection of money proceeds of
narcotics trafficking.  I am also familiar with methods employed by
large narcotics organizations to thwart detection by law enforcement,
including the use of debit calling cards, public telephones, cellular
telephone technology, counter surveillance, false or fictitious
identities, and encoded communications.  During my employment with
the DEA, I have participated in narcotics investigations for
violations of 21 U.S.C. § 841(a)(1) as both a case agent and in a
supportive role.  I have assisted in the arrests of multiple drug
traffickers.  I have participated in several static and mobile
surveillance activities across Southern California and have assisted
in the execution of multiple search warrants.  In addition, I have
conducted investigations regarding the unlawful importation,
possession and distribution of controlled substances.

        8.   Also, during my time assigned to the Los Angeles Field
Division, I have worked on cases involving conspiracies to import
controlled substances, conspiracies to distribute controlled
substances, and money laundering.  Through these investigations, I
have become familiar with the methods used by transnational criminal
organizations to import controlled substances to the United States,

1  methods used to distribute those controlled substances throughout the
2  United States, and methods of laundering proceeds from the
3  distribution of those controlled substances.

4                         III. <u>SUMMARY OF PROBABLE CAUSE</u>

5         9.    DEA agents in Los Angeles are investigating SEPULVEDA, a
6  narcotics trafficker who distributes narcotics in the Central
7  District of California.  On April 30, 2021, a DEA undercover
8  confidential source (CS)[1] conducted a controlled purchase of
9  approximately 300 suspected fentanyl pills from a seller whom
10 investigators later identified as SEPULVEDA.  DEA laboratory testing
11 later confirmed that the suspected fentanyl pills consisted of
12 approximately 32.3 grams of a mixture or substance containing
13 fentanyl.  On July 15, 2021, the CS conducted a controlled purchase
14 of approximately 600 suspected fentanyl pills from SEPULVEDA; testing
15 results for this transaction are pending.  On August 17, 2021, the CS
16 conducted a controlled purchase of approximately 2 pounds of
17 suspected white crystalline substance that is believed to be
18 methamphetamine from a relative of SEPULVEDA, in a controlled
19 purchase that was coordinated by SEPULVEDA.  DEA laboratory testing
20 later confirmed that the white crystalline substance consisted of
21 approximately 858 grams methamphetamine at 95 percent purity.

22        10.    In advance of both transactions, SEPULVEDA spoke with the
23 CS and planned the transactions using the **Subject Telephone.**

24 _____

25        [1] The CS has been cooperating with the DEA since approximately
   January 2021, following DEA's investigation into the CS for drug
26 trafficking.  The CS has a criminal history that includes a prior
   conviction for drug trafficking and several drug-related arrests.
27 During the period of the CS's cooperation, the CS provided reliable
   information regarding narcotics traffickers that DEA corroborated
28 through independent investigation.  The CS is working with the DEA
   for charging consideration in the drug trafficking investigation.

                                    4

Further, SEPULVEDA's subscriber records and visual surveillance show that SEPULVEDA lives in Huntington Park, within the Central District of California.

IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A.   <u>April 30, 2021 Purchase of Approximately 300 Fentanyl Pills</u>

12.  As I understand from speaking to the CS, on April 28, 2021, the CS was given the telephone number of the **Subject Telephone** (that is, (323) 847-4474) by an acquaintance known as "BLONDIE," who told the CS that he/she could call the number and purchase fentanyl pills.

13.  On April 28, 2021, I requested the subscriber information for the **Subject Telephone**.  The subscriber return showed that the cellular telephone number was issued by T-Mobile or its affiliates, and subscribed to "Cesar P Leather" at the address of 3369 California St., Unit A, Huntington Park, CA.

14.  At my direction, on April 29, 2021, the CS called the **Subject Telephone** to inquire about purchasing narcotics.  This call was recorded and took place in Spanish.[2]  During the phone call, the CS informed the unknown Hispanic male (later identified as SEPULVEDA) that he/she had friends coming into town and needed "it" (meaning fentanyl pills).  The Hispanic male confirmed that it would be 400

---

[2] All text messages and calls discussed herein were recorded and took were in Spanish.  The calls and text messages have been translated to me by Spanish-speaking TFOs or SAs.  The following summaries of calls and text messages are not verbatim unless otherwise indicated.

pills for $1,200, and told the CS to keep him posted on when it was needed.

15.   Later, on April 29, 2021, at my direction, the CS sent a text message to the **Subject Telephone**, to ask if it was ok to meet the following day in the afternoon.  The **Subject Telephone** replied via text message stating it was ok and that he "is ready."  Based on my training, experience, and knowledge of this investigation, I believe that when the person using the **Subject Telephone** stated that he was ready, it meant that he had the prearranged narcotics and was ready to conduct the transaction.

16.   On April 30, 2021, at my direction, the CS sent a text message to the **Subject Telephone** asking to meet at 2:00 p.m.  The person using the **Subject Telephone** replied "that's fine."  The CS sent another message regarding a location to meet to conduct the transaction.  The person using the **Subject Telephone** agreed to meet in South Gate, CA.

17.   At approximately 1:00 p.m. on April 30, 2021, I instructed the CS to contact the person using the **Subject Telephone** to confirm the location and time to buy fentanyl pills.  The person using the **Subject Telephone** agreed to the meeting location.

18.   Based on my own presence during the deal and follow-up surveillance and conversations with other SAs who were present and my review of audio and video surveillance of the deal, I understand the following series of events occurred on April 30, 2021:

a.   SA Christopher Sinclair and Group Supervisor Sean Fromson arrived at 3369 California St., Unit A, Huntington Park, CA (the registered address for the **Subject Telephone**) before the agreed meeting and observed a black 2015 Dodge Journey bearing California

license plates 7KHH316 (the "Black Dodge") parked in the driveway of the address.

        b.   The same Black Dodge later arrived at the meet location and parked next to the vehicle of the Undercover SA Thomas Coughlin, where the CS was also present.

        c.   After the Black Dodge arrived, the CS exited the CS's vehicle, approached the passenger side of the Black Dodge, and entered the Black Dodge.  The CS spoke briefly inside the Black Dodge and exchanged $1,200 for approximately 300 suspected fentanyl pills.

        d.   Following the purchase, DEA surveillance teams followed the Black Dodge from the location to an apartment complex where the driver of the Black Dodge met with an unknown male for a brief period of time.  The Black Dodge departed from the apartment complex and arrived at the address of 3369 California St., Huntington Park, CA, where the driver of the Black Dodge exited the vehicle and went to the west side of the residence towards the rear of the address.

    19.  On April 30, 2021, DEA SAs conducted a presumptive test on the suspected fentanyl pills, which returned Acetaminophen which I know, based on my training and experience, is a precursor for fentanyl pills and is often found in test results for substances that contain fentanyl.  On May 28, 2021, I received an official lab report from DEA Southwest Laboratory confirming the suspected pills consisted of approximately 32.3 grams of a mixture or substance containing fentanyl.

    20.  On April 30, 2021, after the controlled purchase, the person using the **Subject Telephone** sent the CS a text message stating that if the CS needed more, to let him know.

21.  On May 11, 2021, at my direction, the CS sent a text message to the **Subject Telephone** inquiring if he had any fentanyl pills.  The user of the **Subject Telephone** stated that he did and asked how many the CS needed.  The CS replied and stated that he/she would let him know.  The user of the **Subject Telephone** confirmed and stated to let him know how many.  Based on my review of the text conversation, I understand that the CS confirmed with the user of the **Subject Telephone** that the user was willing to conduct another narcotics transaction and the user of the **Subject Telephone** advised the CS that he was willing to sell more pills if the CS wanted.

        B.    Identification of Giovanni SEPULVEDA

22.  On July 7, 2021, I, SA Mark Drobac, and Torrance Police Detective Steve Masone were able to use the registration information for Black Dodge to search for the driver of the vehicle using police databases.  The search results indicated that the Black Dodge was linked with one driver: SEPULVEDA.  I obtained a California DMV photograph of SEPULVEDA and presented the photo to SA Thomas Coughlin, who was acting in an undercover capacity during the April 30, 2021 narcotic transaction with the CS and SEPULVEDA.  SA Coughlin confirmed that the person he observed selling the narcotics to the CS was SEPULVEDA.  I also presented the photograph to the CS who was in the Black Dodge with the narcotics seller during the transaction. The CS also confirmed that the narcotics seller was SEPULVEDA.

        C.    July 15, 2021 Purchase of 600 Suspected Fentanyl Pills

23.  On July 14, 2021, at my direction, the CS sent a text message to the **Subject Telephone** inquiring if he had any more pills. SEPULVEDA responded and stated that he does and how many.  The CS stated 600 pills and for how much.  SEPULVEDA responded via text

8

1    message and stated $3.50 per pill.  During this text message

2    communication, SEPULVEDA inquired if the CS would buy that day.  The

3    CS stated that he/she would buy tomorrow morning before 12:00 p.m.

4    SEPULVEDA responded to let him know.

5         24.  On July 15, 2021, at approximately 12:30 p.m., I advised

6    the CS to contact SEPULVEDA via the **Subject Telephone** to confirm the

7    time to conduct the purchase of approximately 600 fentanyl pills for

8    $2,100.00.  As I understand from reviewing the text messages, the CS

9    inquired if SEPULVEDA could meet in about one hour.  SEPULVEDA

10   responded via text message from the **Subject Telephone** with a

11   confirmation and asked the CS if it was ok to meet in Huntington

12   Park, CA.  The CS confirmed to meet in Huntington Park at the Home

13   Depot and asked how long it would take SEPULVEDA to reach the

14   location.  SEPULVEDA replied via text message from the **Subject**

15   **Telephone** and stated he would be at the location in 10 minutes.

16        25.  Based on my own presence during the deal and follow-up

17   surveillance and conversations with other SAs who were present and my

18   review of audio and video surveillance of the deal, I understand the

19   following series of events occurred on July 15, 2021:

20             a.   SEPULVEDA arrived at the pre-arranged location at

21   approximately the scheduled time.  After SEPULVEDA arrived, the CS

22   exited the vehicle and approached the Black Dodge.  The CS and

23   SEPULVEDA spoke briefly and departed.  The CS stated he/she spoke

24   with SEPULVEDA and the CS handed SEPULVEDA $2,100 in exchange for

25   approximately 600 suspected fentanyl pills.

26             b.   Following the purchase at approximately 2:00 p.m.,

27   surveillance teams followed the Black Dodge from the location of the

28   transaction.  Surveillance teams observed the Black Dodge make

several stops and pick up and drop off an unknown Hispanic male before SEPULVEDA drove the Black Dodge to his address of record at 3369 California St., Huntington Park, CA, and entered the driveway. At approximately 4:50 p.m., the Black Dodge departed the residence being driven by an unknown Hispanic female with SEPULVEDA in the passenger seat.  The unknown Hispanic female and SEPULVEDA traveled to various stores before returning to 3369 California St., Huntington Park, CA.

26. On July 15, 2021, DEA SA's conducted a presumptive test on the suspected fentanyl pills, which again returned Acetaminophen, which I know, based on my training and experience, is a precursor for fentanyl pills and is often found in test results for substances that contain fentanyl.  Further formal testing results are pending.

D. <u>Based on the above, including the visual surveillance of SEPULVEDA and the subscriber information on the **Subject Telephone**, I believe that SEPULVEDA resides in the Central District of California and the **Subject Telephone** is being used by SEPULVEDA in the Central District of California to conduct narcotics transactions. August 17, 2021 Purchase of Approximately Two Pounds of Methamphetamine from SEPULVEDA's Associate.</u>

27. On August 12, 2021, at my direction, the CS sent a text message to the **Subject Telephone** inquiring if SEPULVEDA had any "frosts," which I understand to be a code word for methamphetamine. SEPULVEDA responded via text message stating that he did have "frost," and asking how many the CS would need.  The CS responded by stating that he/she will need 2 (meaning 2 pounds).  SEPULVEDA responded that it would be $1,100 per pound and for the CS to let him know when the CS needed to purchase.

28. On August 16, 2021, at my direction, the CS sent a text message to the **Subject Telephone** inquiring if SEPULVEDA would be able

to conduct a transaction the next day, on August 17, 2021.  SEPULVEDA responded to the CS stating that he was currently in Las Vegas and would return on Thursday, but that he would see if he could send his cousin on his behalf to meet the CS.  SEPULVEDA then responded and stated that his cousin could meet the CS on August 17, 2021.

29.  On August 17, 2021, SEPULVEDA sent a text message from the **Subject Telephone** to the CS stating that his cousin could meet in Florence, California, whenever the CS was ready.  The CS and SEPULVEDA ultimately arranged for the CS to meet SEPULVEDA's cousin at approximately 2:30 p.m. in the parking lot of a chain sandwich restaurant on Firestone Blvd., in Bell, California.  SEPULVEDA stated that his cousin would arrive in a blue Honda.

30.  Based on my own presence during the deal and follow-up surveillance and conversations with other SAs who were present and my review of audio and video surveillance of the deal, I understand the following series of events occurred on August 17, 2021:

a.  At approximately 2:35 p.m., a person who appeared to be SEPULVEDA's cousin arrived in a blue Honda and conducted the narcotics transaction with the CS.  The CS purchased approximately two pounds of a white crystalline substance suspected to be methamphetamine for $2,200 from the person believed to be SEPULVEDA's cousin.

31.  On August 17, 2021, DEA SAs conducted a presumptive test on the white crystalline substance suspected to be methamphetamine, which returned with a positive identification of the substance as methamphetamine.

32.  On August 26, 2021, I received an official lab report from DEA Southwest Laboratory confirming the suspected white crystalline

substance consisted of approximately 858 grams of methamphetamine at 95 percent purity.

33.   I seek GPS/cell-site information via this application because this information will assist me in gathering evidence in the ongoing investigation I have described above in the following ways: (1) I am investigating a conspiracy, and determining concert of action and contact between the conspirators is of value to my investigation; (2) the information will allow me to identify members of the conspiracy that I have not previously identified; (3) the information will provide insight into the roles and actions of the members of the conspiracy, and the criminal conduct committed by the people being investigated; (4) it will provide information regarding whether the individuals being investigated meet or have contact prior to, or after, committing any criminal conduct; and (5) the information will often identify locations where evidence is stored and where search warrants may be appropriate.  Moreover, it will assist in targeting surveillance conducted in this case, and reduce the risk of being detected and revealing the nature or fact of the investigation.  People who are involved in criminal activity are often conscious of being followed and keep a close eye out for surveillance units.  The chance of being discovered increases with the more surveillance that is done and the closer the surveillance units must get to the target subjects.  Use of the prospective cell-site/GPS information enables the investigative team to be more focused and judicious in its use of surveillance to those times when it appears that events of significance are going to occur.  It also allows the investigative team the ability to conduct surveillance at

12

a greater distance, because the fear of losing the target is reduced when surveillance is maintained via GPS/cell-site information.

V.    TECHNICAL BACKGROUND REGARDING CELL-SITE SIMULATORS

34.   Based on my training an experience and my conversations with other agents and investigators, I understand the following regarding cell-site simulators:

a.    Cell-site simulators function by transmitting as a cell tower.  In response to the signals emitted by the simulator, cellular devices in the proximity of the device identify the simulator as the most attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower.

b.    A cell-site simulator receives and uses an industry standard unique identifying number (e.g., Electronic Serial Number (ESN), Mobile Equipment Identifier (MEID), International Mobile Subscriber Identity (IMSI), International Mobile Equipment Identity (IMEI), Mobile Station Identity (MSID), Mobile Directory Number (MDN) or the Universal Fleet Member Identity (UFMI)) that is assigned by a device manufacturer or cellular network provider.  When used to locate a known cellular device, a cell-site simulator initially receives the unique identifying number from multiple devices in the vicinity of the simulator.  Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone.

c.    By transmitting as a cell tower, cell-site simulators acquire the unique identifying information from cellular devices. This identifying information is limited, however.  Cell-site simulators provide only the relative signal strength and general

13

direction of a subject cellular telephone; they do not function as a GPS locator, as they do not obtain or download any location information from the device or its applications.  Moreover, cell-site simulators do not collect the contents of any communication.  This includes any data contained on the phone itself:  the simulator does not remotely capture emails, texts, contact lists, images, or any other data from the phone.  In addition, cell-site simulators do not provide subscriber account information (for example, an account holder's name, address, or telephone number).

VI.   INTENDED USE OF THE CELL-SITE SIMULATOR AND
DELETION OF NON-TARGET DATA

35.   Investigators intend to use the cell-site simulator to send signals to the **Subject Telephone** that will cause the **Subject Telephone,** and non-target cellular phones on the same provider network in close physical proximity, to emit unique identifying information, which the cell-site simulator will collect. Investigators will then use the information collected by the cell-site simulator to determine the physical location of the **Subject Telephone**.  Investigators plan to use the cell-site simulator to determine unique identifiers at multiple locations and/or multiple times at the same location.

36.   Although the cell-site simulator will collect the unique identifiers not only of the **Subject Telephone,** but also identifiers belonging to nearby non-target cellular telephones, these latter identifiers will not be used by law enforcement for investigative purposes, just as the extraneous incoming and outgoing telephone numbers necessarily recorded by conventional pen registers and trap-and-trace devices are not used for affirmative investigative

14

purposes.  Absent further order of the court, law enforcement will make no investigative use of information concerning non-targeted cellular devices other than distinguishing the **Subject Telephone** from all other devices.  Once law enforcement has located the **Subject Telephone**, it will delete all information not associated with the **Subject Telephone.**

37.  The cell-site simulator may interrupt cellular service of cellular devices within its immediate vicinity.  Any service disruption will be brief and temporary, and all operations will attempt to limit the interference with cellular devices.

## VII. GROUNDS FOR SEALING AND DELAYING NOTICE

38.  Based on my training and experience and my investigation of this matter, I believe that reasonable cause exists to seal this application and warrant, as well as the return to the warrant.  I also believe that reasonable cause exists to delay the service of the warrant by the Investigating Agency as normally required for a period of 30 days beyond the end of the disclosure period pursuant to 18 U.S.C. § 3103a(b) and, pursuant to 18 U.S.C. § 2705(b), to enter an order commanding the Carrier not to notify any person, including the subscriber(s) of the **Subject Telephone,** of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; or (4) otherwise

15

seriously jeopardizing the investigation.  Specifically, SEPULVEDA is the target of an investigation involving the sale of narcotics.  This investigation may last longer than the disclosure period, particularly if the investigation into SEPULVEDA reveals connections to more significant traffickers, firearms, or other criminal activities, requiring additional investigation efforts.  In the meantime, should SEPULVEDA realize he is the target of an investigation (as would likely occur should he receive notice), SEPULVEDA could take steps to flee from prosecution, destroy or tamper with evidence to hide his misdeeds, intimidate or threaten the witnesses (including the CS), or warn other criminals who are assisting SEPULVEDA with his crimes.

39.  Furthermore, there is good cause for the warrant to be issued such that the information may be provided to law enforcement at any time of the day or night because in my training and experience, and knowledge of this investigation, the subjects of the investigation do not confine their activities to daylight hours, and it is often even more difficult to conduct surveillance at night.

VIII.   <u>CONCLUSION</u>

40.  For all of the above reasons, there is probable cause to believe that prospective cell-site information, GPS information, as well as information from a cell-site simulator, likely to be received concerning the approximate location of the **Subject Telephone,** currently within, or being monitored or investigated within, the Central District of California, will constitute or yield evidence of violations of the Target Offenses being committed by the Target Subjects.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this ____ day of September, 2021.

_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

17